IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| JOYCE BEVERLY, | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. SAG-22-2624 |
| TRUSTMARK HEALTH BENEFITS, INC., *et al.*, | * | |
| Defendants. | * | |

## MEMORANDUM OPINION

This case involves a claim for Title VII and 42 U.S.C. § 1981 retaliation brought by Joyce Beverly against her former employer, Defendant Trustmark Health Benefits, Inc. ("THBI"). Discovery has now concluded and THBI has filed a motion for summary judgment, ECF 18. This Court has reviewed the motion, along with the opposition, reply, and associated exhibits. ECF 22, 26. For the reasons set forth herein, THBI's motion will be GRANTED.

### I. FACTS

During the time relevant to this action, Plaintiff worked for THBI as a Customer Service Representative ("CSR"). ECF 22-1 at 10:16–20. On November 17, 2019, one of Plaintiff's colleagues, Stacie Perkins, filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging that THBI engaged in racial discrimination and fostered a racially abusive hostile work environment. ECF 22-2. Sometime later, Perkins asked Plaintiff to submit a witness statement in support of her discrimination charge. ECF 22-1 at 15:10–19. Plaintiff provided a witness statement on May 18, 2020, in which she described a "discriminatory, biased, neglectful, and racist[ ]" culture at the company. ECF 22-5.

1

On August 7, 2020, the EEOC concluded its investigation of Perkins's charge and issued her a Notice of Right to Sue. ECF 22-6. The Notice of Right to Sue was copied to Nicole Jagielski, Esq., counsel for Trustmark, which at the time was the parent company of THBI. *Id.*; ECF 22-8 at 10:1–11:8. On October 9, 2020, an attorney for Perkins, Joseph Mallon, Esq., sent a demand letter ("the demand letter") to Miriam Petrillo, Esq., an outside lawyer for Trustmark. ECF 22-3. The demand letter attached and expressly referenced Plaintiff's witness statement. *Id.* at 10, 20–21. Petrillo contacted Jagielski about the demand letter and its contents. ECF 22-7. Following the demand letter, Perkins filed suit in the Baltimore County Circuit Court on November 5, 2020. ECF 22-14. Perkins's complaint expressly referenced Plaintiff's witness statement and its contents, identifying Plaintiff by name. *Id.* at 11. About two months later, on January 7, 2021, Perkins settled her lawsuit and dismissed the case. ECF 22-18.

In the meantime, on October 12, 2020, James Polinsky, the Associate Director of Health Benefits Customer Service, emailed THBI's Northeast Customer Service Supervisors, indicating that nine CSRs, including Plaintiff, were struggling in their performance because they were not averaging more than 35 calls per day. ECF 22-10. A few months later, on December 3, 2020, one of those supervisors, Brian Daugherty, emailed a report with the November call metric data for dozens of employees. ECF 22-15. Upon receiving the report, Polinsky asked another supervisor to "Check out [Plaintiff's] numbers from 11/25 and 11/30." *Id.* at 1. Plaintiff handled 18 calls on November 25, 2020, *id.* at 2, and 20 calls on November 30, 2020, *id.* at 3. On each date, there were other employees who handled the same or lower numbers of calls. *Id.* at 2–3.

On February 12, 2021, Rebecca Reinhart and Kelsey Fox-LaMure decided that Plaintiff should be transferred to a CSR supervisory position in the Secure Plan Help Desk Queue ("HDQ") to cover for an employee who was absent. ECF 22-17 at 14:1–19; ECF 22-20 ¶ 6. The Secure Plan

involves calls from employees, which are handled by a more limited group of experienced CSRs due to the potential to interact with other employees' personal health information. ECF 22-17 at 13:5–16. CSRs working in the Secure Plan, as opposed to the HDQ, handle regular calls along with calls from employees in the Secure Plan. *Id.* at 15:4–6. HDQ calls are escalated in nature, meaning that they are more likely to be protracted calls. ECF 22-21 at 23:9–24:1. Plaintiff was removed from her service on the HDQ on February 18, 2021, though she remained part of the Secure Plan. ECF 22-17 at 16:5–8; ECF 22-21 at 21:6–20, 22:9–19.[1]

In this same time frame, supervisors continued criticizing Plaintiff's performance, citing low call volume. *See* ECF 22-12 at 10 ("[I]t has been a difficult first half of 2021 in regards to your productivity and call metrics."). Plaintiff regularly received write-ups for averaging less than 35 calls per day. *Id.* at 10, 12–13. Plaintiff repeatedly told her supervisors that her placement in the Secure Plan was impacting her ability to meet that threshold. *See id.* at 13; ECF 22-20 ¶ 10; ECF 22-21 at 19:7–11.

Fox-LaMure sent an email on March 8, 2021, indicating that Plaintiff's performance had improved since being removed from the HDQ. ECF 22-23 at 2. However, the call data from April, 2021 reflected that Plaintiff was still handling about 50% employee plan phone calls, and was still not meeting the 35 call per day threshold. ECF 22-24 at 2.

On May 1, 2021, Polinsky placed Plaintiff on a Performance Improvement Plan ("PIP") for failing to meet productivity standards. ECF 22-12 at 12–13; ECF 22-25. On May 3, 2021,

---

[1] The record is somewhat muddled as to the exact relationship between the "HDQ," the Secure Plan, and the nature of the calls Plaintiff received per day. THBI avers that Plaintiff was only covering the HDQ for a six-day span, while Plaintiff contends she had to handle more difficult employee calls for a longer period of time. Ultimately, because Plaintiff offers no evidence that any of the persons involved in decisions about her employment status knew of the Perkins matter, any factual dispute about those positions and what date she was removed from them is immaterial.

Reinhart processed an iform removing Plaintiff from the Secure Plan. ECF 22-17 at 16:18–17:19. However, Plaintiff contends that she continued to receive some employee plan calls, which continued to derail her efforts to meet her target goals. ECF 22-1 at 84:6–86:5; ECF 22-20 ¶ 11–12.

On June 2, 2021, the Executive Director of Customer Service asked Polinsky to identify candidates for a reduction in force. ECF 22-29. Polinsky responded with four names, including Plaintiff's. *Id.* In July, 2021, Fox-LaMure noted in an email that Plaintiff's performance was improving. ECF 22-30. However, on August 9, 2021, Plaintiff was placed on a final PIP, which noted that Plaintiff had been removed from the Secure Plan to aid in her success. ECF 22-12 at 15–17. At the end of 2021, Plaintiff received her Year-End Review, which rated her as "struggling." *Id.* at 22. In response, Plaintiff wrote the following comment:

> My call quantity was greatly effected [sic] due to management placing me in the Help Desk Call Queue without compensation or permission. This queue greatly reduces call volume due to complicated and lengthy issues. This was brought to management and Human Resources attention and the results were systemic retaliation. My placement in work queues were lowered. I often waited for calls. Hopefully my queues have been corrected and I will receive the correct calls and call volume.

*Id.* at 22; ECF 18-4 at 4.

In January, 2022, Polinsky and Cleckner approached Ann Kroepel, in Human Resources, to request that Plaintiff be terminated from her employment. ECF 22-33 at 9:13–10:9, 12:3–13:2. Because termination requests require supervisory approval, Kroepel began coordinating with Pamela Tsapalas in HR, providing her with information from Polinsky and Cleckner about Plaintiff's statistics and performance reviews, along with departmental call averages. *Id.* at 26:1–27:5; ECF 22-35.

In February and March, 2022, Plaintiff's meetings with Cleckner indicated that she was showing some improvement. ECF 22-38, 22-40. Nevertheless, on March 28, 2022, Kroepel terminated Plaintiff's employment, after receiving approval from Jagielski. ECF 22-41, 22-42.

## II.     STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)). The mere existence of a "scintilla of evidence" in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107 F. Supp. 2d at 671).  If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case

5

"necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.   ANALYSIS

Plaintiff asserts that adverse actions, including termination, were taken against her in retaliation for her complaints of discrimination. Because Plaintiff lacks direct evidence of retaliation, she relies on the framework of *McDonnell Douglas v. Green,* 411 U.S. 792 (1973), which first requires a plaintiff to establish a prima facie case of retaliation by a preponderance of the evidence. A prima facie case of retaliation requires proof that: (1) the plaintiff engaged in protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action. *Smith v. CSRA*, 12 F.4th 396, 416 (4th Cir. 2021). THBI contends that Plaintiff cannot establish either the first or third element of a prima facie case. This Court finds that Plaintiff can establish the first element but cannot establish the third element.[2]

As to the first element, protected activity can fall into two categories: participation and opposition. Participation occurs when an employee "has made a charge, testified, assisted, or participated in any investigation, proceeding, or hearing" involving Title VII. 42 U.S.C. § 2000e-3(a). Oppositional activities include voicing opinions about an employer's discriminatory activities or complaining about suspected violations. *See, e.g.*, *EEOC v. Navy Fed. Credit Union,*

---

[2] THBI argues that job reassignments and the issuance of personal improvement plans do not constitute adverse employment actions under the second element. This Court assumes, without deciding, that they do.

424 F.3d 397, 406 (4th Cir. 2005). Plaintiff contends that she engaged in both: protected activity when she provided a witness statement to Perkins for use in her discrimination lawsuit in May, 2020, and oppositional activity when her witness statement became part of the Perkins demand letter in October, 2020 and Perkins complaint in November, 2020, and also when she referenced "systemic retaliation" in her comment to her performance evaluation in January, 2022.

This Court agrees with Plaintiff that her involvement with the Perkins matter constitutes protected participation in a Title VII proceeding. Plaintiff made herself available as a witness and submitted a written statement that became part of both Perkins's demand letter and her eventual court filing. *Cf. Glover v. S.C. L. Enf't Div.*, 170 F.3d 411, 414 (4th Cir. 1999) ("[A]ll testimony in a Title VII proceeding is protected against punitive employer action."). However, this Court disagrees that Plaintiff's reference to "systemic retaliation" in response to her performance evaluation constituted oppositional activity. To engage in protected "opposition," an employee must communicate opposition to an action that the employee believes amounts to a Title VII violation. *Netter v. Barnes,* 908 F.3d 932, 937 (4th Cir. 2018). In other words, the opposition must relate to discrimination based upon 'race, color, religion, sex or national origin.'" *Landino v. Sapp*, 520 F. App'x 195, 198 (4th Cir. 2013) (citation omitted).

Plaintiff's response to her performance evaluation makes no reference to discrimination on the basis of any protected class. Instead, it expressly states that "systemic retaliation" resulted from her bringing her placement in the HDQ to the attention of management and Human Resources, resulting in her receiving lower placement in work queues. ECF 18-4 at 4. The words, "systemic retaliation," are not unique to discrimination cases, and Plaintiff's comment cannot fairly be read to suggest or refer to opposition to any discriminatory or Title VII-related activity. Thus, with

respect to her retaliation claim, Plaintiff's sole protected activity is her involvement in the Perkins matter.

Despite her engaging in that protected activity, Plaintiff's claim fails because she has not adduced evidence of any causal connection between her protected activity and any adverse action that she suffered. Her proof is missing a crucial element, in that she fails to connect the dots between persons who were aware of her involvement in the Perkins matter and persons who made decisions about her employment status. The Fourth Circuit requires actual knowledge by the decisionmaker, not constructive knowledge imputed from other employees' knowledge. *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123–26 (4th Cir. 2021) (rejecting Title VII retaliation claim by a former employee who complained about sexual harassment to his supervisors but not to the CEO who terminated him). Here, the record reflects no evidence that any of the decisionmakers who assigned her to the HDQ, placed her on PIPs, or made the eventual recommendation to terminate her—namely Reinhart, Polinsky, Fox-LaMure, Kroepel, Tsapalas, or Cleckner—knew about Plaintiff's involvement in the Perkins lawsuit at any time before the instant lawsuit began. *See* ECF 22-11 at 16:20–18:8 (Polinsky's testimony that he had no knowledge of the Perkins matter or Plaintiff's involvement as a witness); ECF 22-17 at 24:16–28:15 (Reinhart's testimony that although she knew that Perkins had filed a lawsuit before Plaintiff was terminated, she had never seen the demand letter or complaint and did not know of Plaintiff's role as a witness until this litigation); ECF 22-21 at 9:10–13:3 (Fox-Lamure's testimony that she had no knowledge of Perkins's lawsuit or Plaintiff's involvement as a witness); ECF 22-33 at 17:5–19:16 (Kroepel's testimony that she had no knowledge of Perkins's lawsuit or Plaintiff's involvement as a witness); ECF 22-34 at 43:12–18, 45:7–49:9 (Tsapalas's testimony that she had no knowledge of the Perkins lawsuit or Plaintiff's witness statement); ECF 22-39 at 10:1–13:17

(Cleckner's testimony that she had no knowledge of Perkins's EEOC charge or lawsuit or Plaintiff's witness statement). Plaintiff's evidence establishes only that Nicole Jagielski, counsel to THBI's parent company, worked on the Perkins matter and had received information about Plaintiff's involvement. Jagielski testified that she did not recall having any conversations with any of Plaintiff's supervisors, or any other Trustmark employee, about Plaintiff.[3] ECF 22-8 at 13:20–15:16. People who do not know of a protected action cannot retaliate for it.

Moreover, even if temporal proximity alone could suffice to establish causation in the absence of any evidence of knowledge, no temporal proximity exists here. Plaintiff submitted her witness statement to Perkins in May, 2020. Her name was mentioned in Perkins's demand letter on October 9, 2020, and in the complaint on November 5, 2020. But Plaintiff was not assigned to the HDQ until February 12, 2021, was not placed on PIPs until May 1, 2021 and August 9, 2021, and was not terminated until almost two years after the protected activity, in March, 2022. These time spans exceed those that could reasonably support an inference of retaliation, even if any of the decisionmakers knew that protected activity had occurred. *See, e.g.*, *Laurent-Workman v. Wormuth*, 54 F.4th 201, 219 (4th Cir. 2022) ("Although there is no bright-line rule for when temporal proximity helps or hurts a cause of action for retaliation, a two-month temporal gap . . . is sufficiently long so as to weaken significantly the inference of causation.") (citations omitted).

---

[3] Plaintiff suggests that Jagielski suffers from "selective amnesia" and that a reasonable juror could infer that she is being dishonest because, according to Kroepel's testimony, Jagielski participated in Plaintiff's termination meeting and approved the decision to terminate Plaintiff. But the testimony only shows that Kroepel had a call with Jagielski about Plaintiff's possible termination; it does not show that Jagielski told Kroepel about Plaintiff's involvement in the Perkins lawsuit. ECF 22-33 at 28:7–30:10. In fact, Kroepel unequivocally testifies that she had no knowledge of that. *Id.* at 17:5–19:16. Plaintiff cannot show a genuine dispute of material fact based on mere speculation that Jagielski told Kroepel about Plaintiff's involvement.

Plaintiff's attempts to prove temporal proximity are unavailing. Initially, Plaintiff argues that the three-month period between her latest protected activity and her first adverse action "stand[s] on the edge of temporal proximity that courts have found sufficient to support a claim." *Mason v. Netcom Techs., Inc.*, No. 20-CV-03558, 2021 WL 4286535, at *5 (D. Md. Sept. 21, 2021). The court in *Mason* held that the plaintiff satisfied the element of causation despite a three-month intervening period because other pieces of evidence suggested retaliatory animus. *Id.* But *Mason* is inapplicable here because other relevant evidence does not support a finding of retaliatory animus. Plaintiff describes Polinsky's efforts to investigate and "single[ ] . . . out" Plaintiff's work performance, ECF 22 at 29, but as explained above, his efforts cannot be reasonably linked to Plaintiff's protected activities because he was not aware of those activities.

To prove temporal proximity, Plaintiff alternatively points to the one-month difference between her allegation of "systematic retaliation" and her termination. But as explained above, her allegation does not constitute protected activity, so there is no temporal proximity between protected activity and an adverse employment action.

Finally, Plaintiff argues that a lengthy time period does not dispose of her claims so long as the employer retaliates upon its first "opportunity to do so." *Templeton v. First Tennessee Bank, N.A.*, 424 F. App'x 249, 251 (4th Cir. 2011); *see also Stevens v. Charles Cnty., Maryland*, No. 20-CV-3522, 2022 WL 2362283, at *8–9 (D. Md. June 30, 2022). But in the cases that Plaintiff cites, some circumstance explained why the employer could not have acted sooner than it did. *See Templeton*, 424 F. App'x at 251 (two-year period between employee's harassment complaint and employer's refusal to hire her did not preclude an inference of causation because she resigned during the intervening period); *Stevens*, 2022 WL 2362283, at *9 (six-month period between employee's discrimination complaint and her negative performance evaluation did not preclude an

inference of causation because the employer hired an outside law firm to investigate his complaint during the intervening period). Here, no circumstance explains why THBI could not have acted against Plaintiff sooner than February, 2021.[4]

Because Plaintiff offers no evidence of causation, she cannot meet the requirements for a prima facie case of retaliation, and summary judgment is warranted.

## IV.     CONCLUSION

For the reasons set forth above, THBI's Motion for Summary Judgment, ECF 18, is GRANTED and summary judgment is entered in favor of THBI. A separate Order of Judgment follows.

Dated:  October 19, 2023

                                /s/
Stephanie A. Gallagher
United States District Judge

---

[4] Plaintiff implies that the Perkins lawsuit was analogous to the law firm investigation in *Stevens*. But the *Stevens* investigation concerned an employee's discrimination complaint in the context of an ongoing performance evaluation, *Stevens*, 2022 WL 2362283, at *2–3, whereas the Perkins lawsuit does not concern Plaintiff's discrimination complaint or an ongoing performance evaluation.